<u>**AFFIDAVIT IN SUPPORT OF A**</u>
<u>**CRIMINAL COMPLAINT AND SEARCH WARRANTS**</u>

I,  Mark J. Concannon, being sworn, state:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I am a Task Force Officer ("TFO") of the Drug Enforcement Administration ("DEA") and have been so employed since October 2012.

2.      In 2003, I graduated from the Massachusetts Criminal Justice Training Council basic reserve intermittent academy. In 2005, I graduated from the Massachusetts State Police Academy. I have been a police officer since 2005. As a Massachusetts State Trooper, I was initially assigned to patrol out of the Danvers and Norwell Barracks, and then to the Community Action Team in the city of Brockton working in a high-crime area focusing on gang and drug activity.  In October of 2012, I was assigned to the Division of Investigative Service and to the DEA working as a TFO in the Boston Tactical Diversion Squad. Since the spring of 2017, I have been assigned to the Boston Organized Crime Drug Enforcement Task Force ("OCDETF") Strike Force, which is a strike force incorporating various law enforcement agencies, including DEA, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Federal Bureau of Investigation ("FBI"), Immigration and Customs Enforcement Homeland Security Investigations ("HSI"), and the U.S. Marshals Service ("USMS"), among other agencies.

3.      I have a Bachelor of Science degree in Criminal Justice from the University of Massachusetts, Lowell. I have attended numerous narcotics investigation courses, including a

two-week narcotics investigation training with the DEA, focusing on narcotics recognition, identification, and investigation.

4.     During my time as a police officer and TFO, I have participated in numerous investigations and arrests involving violations of state and federal controlled substances laws, including Title 21, United States Code, Sections 841(a)(1) and 846. A number of those investigations resulted in arrests, indictments, and convictions for violations of drug laws and/or other criminal offenses, the seizure of drugs, money, and vehicles, and the forfeiture of personal property. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

5.     During my time with DEA, I have participated in numerous wiretap investigations, and I have been the case agent and affiant for one such investigation.  In connection with my participation in prior wiretap investigations, I have listened to intercepted communications, reviewed transcripts of those communications, and reviewed intercepted text messages and Blackberry pin to pin messages. I also have conducted physical surveillance in connection with wiretap investigations, as well as utilized global positioning system ("GPS") devices on

automobiles and GPS information for cellular telephones to surveil targets of wiretap investigations. I have worked with cooperating witnesses in conjunction with wiretap investigations and have debriefed targets of wiretaps after they have been arrested. I also have executed search warrants during the course of wiretap investigations and participated in seizures of drugs and drug proceeds in connection with such investigations.

## PURPOSES OF THE AFFIDAVIT

6.     This affidavit is being submitted in support of a criminal complaint against the following individuals:

|     |     |
|-----|-----|
| (1) | John MATEO; |
| (2) | Luis Mateo Arias ("LUIS"); |
| (3) | Andrew Mateo ("ANDREW"); |
| (4) | Carlos CARRASQUILLO; |
| (5) | Wilanter Galva RUIZ; |
| (6) | Christopher COLLEY; |
| (7) | Kathleen DESANTIS; |
| (8) | Jomar VENTURA; |
| (9) | Sara LOVEREN; |
| (10) | Scott BOULTER; and |
| (11) | Luis Ramon ORTIZ, |

charging that beginning at least in or about January 2024 and continuing until the present, did knowingly and intentionally combine, conspire, confederate, and agree with each other and others known and unknown, to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. §846 (the "Target Offense").

7.     This affidavit is also being submitted in support of applications for search warrants for the following target locations, which are described in greater detail below and in attachments to the relevant warrant applications and warrants:

    a.   11 Chesley Street, Millville, Massachusetts ("Target Location 1" or "MATEO's Residence");

    b.   48-50 Brookfield Street, Lawrence, Massachusetts ("Target Location 2" and "LUIS's Residence")

    c.   590 American Legion Highway, Apt. 6, Roslindale, Massachusetts ("Target Location 3" or "COLLEY's Residence")

    d.   17 Bickford Street, Apt. 202, Jamaica Plain, Massachusetts ("Target Location 4" or "MATEO's stash location")

    e.   488 Newbury Street, Springfield, Massachusetts ("Target Location 5" or "ANDREW's Residence")

(collectively, the "Target Locations").

    8.    The facts in this affidavit come from my personal observations and information obtained from other agents, investigators, and witnesses. My interpretations of conversations, conduct, and events detailed herein are based on my training and experience and knowledge of the investigation. This affidavit is intended to show that there is sufficient probable cause to believe that the Target Subjects identified herein have committed the Target Offense, and that evidence, fruits, and instrumentalities of that offense will be found in the Target Locations as described below and in attachments B-1 and B-2 of the respective warrants, and does not set forth all of my knowledge about this matter. All times herein are approximate.

## PROBABLE CAUSE

### Relevant Prior History

    9.    On April 25, 2024, the Honorable Julia E. Kobick, United States District Judge, District of Massachusetts, issued an Order authorizing the interception of wire and electronic communications to and from (857) 274-5808 ("Target Telephone 5808") used by MATEO. On May 23, 2024, Judge Kobick issued an Order authorizing the continued interception of wire and electronic communications over Target Telephone 5808. Interceptions began on April 26, 2024, and terminated on June 21, 2024.

    10.   On August 5, 2024, Judge Kobick issued an Order authorizing the renewed interception of wire and electronic communications over Target Telephone 5808 used by

MATEO, and the initial interception of wire communications over (781) 888-7090 ("Target Telephone 7090"), a cellular telephone subscribed to and used by MATEO.  Interceptions began on August 5, 2024, and terminated on September 3, 2024.

11.     On September 30, 2024, Judge Kobick issued an Order authorizing the renewed interception of wire and electronic communications over Target Telephone 5808 used by MATEO, and the initial interception of wire and electronic communications over (305) 927-0786 ("Target Telephone 0786") used by LUIS.  Interceptions began on October 1, 2024, and terminated on October 30, 2024.

12.     On October 22, 2024, Judge Kobick issued an Order authorizing the initial interception of wire and electronic communications over (857) 421-2247 ("Target Telephone 2247") used by MATEO.  Interceptions began on October 23, 2024, and are ongoing.

**Background of Investigation**

13.     Since around January 2024, DEA Boston Strike Force investigators have been investigating a drug trafficking organization ("DTO") led by MATEO that distributes fentanyl, cocaine, and methamphetamine in Massachusetts, New Hampshire, and Maine, and launders drug proceeds.  The Target Subjects are part of the DTO, including individuals conducting the DTO's affairs, such as ANDREW, LUIS, and RUIZ, and other individuals who acquire distribution quantities of drugs from MATEO which they in turn redistribute to other downstream customers, such as CARRASQUILLO, COLLEY, VENTURA, LOVEREN, BOUTLER, and ORTIZ.  As detailed below, the investigation included court-authorized interceptions that demonstrated the Target Subjects' involvement in the DTO's ongoing drug trafficking activities.  Throughout the course of this investigation, investigators have obtained court authorization to obtain precise location data for the Target Subjects' phones and to install GPS tracking devices on vehicle used

by some of the Target Subjects, obtained toll records for phones used by the Target Subjects, and conducted physical and video surveillance of the DTOs operations. Through these efforts, investigators have identified a number of individuals who are working with or being supplied by the Target Subjects, phones and vehicles used by the Target Subjects to facilitate their drug trafficking activities, and locations believed to be used to store drugs or drug proceeds, which include the Target Locations. As detailed herein, there is probable cause to believe that the Target Subjects have violated the Target Offense and that the Target Locations will contain evidence, fruits, and instrumentalities of the Target Offense.

### The Target Subjects

14.     **MATEO**.   Based on intercepted communications, undercover drug purchases, drug and firearm seizures, and surveillance, MATEO is believed to be the leader of the DTO, which distributes fentanyl, methamphetamine, and cocaine to numerous customers in Massachusetts, New Hampshire, and Maine. MATEO is the holder of dispatch phones which are used to coordinate the delivery and acquisition of drugs, and MATEO directs other members of the DTO in such ways as where to deliver drugs, how to mix and package drugs, and what to do with drug proceeds.  MATEO primarily resides at 11 Chesley Street in Millville, Massachusetts (*i.e.*, Target Location 1).  During the investigation, MATEO also regularly used 17 Bickford Street, Apt. 202, in Boston, Massachusetts (*i.e.*, Target Location 4) as an alternate residence and stash location.

15.     **LUIS**.   LUIS is the main drug courier for MATEO and regularly delivers drugs to customers in Massachusetts, New Hampshire, and Maine. LUIS assists MATEO in the daily distribution of drugs, including storing and preparing drugs for the DTO's customers and other couriers.  LUIS sold drugs to an undercover officer for multiple transactions that were arranged

by MATEO.  In addition, on May 24, 2024, investigators seized a firearm from LUIS after LUIS received the firearm from CARRASQUILLO in exchange for drugs, in a transaction orchestrated by MATEO. LUIS resides at 48-50 Brookfield Street in Lawrence, Massachusetts (*i.e.*, Target Location 2).

16.     **ANDREW**.  ANDREW is believed to be the brother of MATEO and is involved in the MATEO DTO's operations. Based on intercepted calls, I believe that, at certain times, ANDREW operated a dispatch telephone for the MATEO DTO, which was used to coordinate the delivery and acquisition of drugs.  On August 27, 2024, investigators seized a kilogram of fentanyl from ANDREW after ANDREW met with one of the DTO's drug suppliers, after which ANDREW fled the United State to the Dominican Republic for almost two months.  ANDREW resides at 488 Newbury Street in Springfield, Massachusetts (*i.e.*, Target Location 5).

17.     **CARRASQUILLO.**    CARRASQUILLO regularly purchased distribution quantities of drugs from MATEO that CARRASQUILLO in turn would sell to his customers.  On May 24, 2024, investigators seized a firearm from LUIS after LUIS received the firearm from CARRASQUILLO in exchange for drugs, in a transaction orchestrated by MATEO. CARRASQUILLO is presently—and has been throughout this investigation—on probation resulting from a Maine state court conviction for trafficking in controlled substances.

18.     **RUIZ.** RUIZ is a courier for the MATEO DTO, conducting drug transactions with other members of the DTO and delivering drug proceedings.

19.     **COLLEY.**  COLLEY regularly purchased distribution quantities of drugs from MATEO that COLLEY in turn would sell to his customers.  COLLEY is presently—and has been throughout this investigation—on pretrial release from a Norfolk Superior Court case where he is

charged with trafficking fentanyl and cocaine.  COLLEY resides at 590 American Legion Highway, Apt. 6, in Roslindale, Massachusetts (*i.e.*, Target Location 3).

20.     **DESANTIS.**  DESANTIS regularly purchased drugs from MATEO.  On May 9, 2024, investigators seized a package from the U.S. mail that was addressed to DESANTIS's residence, which contained a kilogram of fentanyl.  Intercepted communications about the package demonstrated that DESANTIS intended to receive the package for MATEO, and DESANTIS took efforts to try to retrieve the package after it was seized.

21.     **VENTURA.**  VENTURA regularly purchased distribution quantities of drugs from MATEO.  VENTURA's criminal history includes a 2019 federal conviction for distribution of and possession with intent to distribute heroin and fentanyl.  VENTURA was on supervised release from that conviction for a portion of the activity in this case, until his supervised release was revoked, and he was sentenced to three months of imprisonment; after he was released from that revocation sentence, he resumed conducting drug transactions with the MATEO DTO.

22.     **LOVEREN.**  LOVEREN regularly purchased distribution quantities of drugs from MATEO, which LOVEREN would in turn sell to her customers.

23.     **BOUTLER.**  BOULTER regularly purchased distribution quantities of drugs from MATEO, which BOULTER would in turn sell to his customers.  BOULTER also helped recruit new drug customers and redistributors for the MATEO DTO.

24.     **ORTIZ.**  ORTIZ regularly purchased distribution quantities of drugs from MATEO, that ORTIZ would in turn sell to his customers.  ORTIZ has a criminal history that includes a prior federal conviction for distribution of cocaine.

May 9, 2024, Seizure of a Package Containing Fentanyl from the U.S. Mail
sent to DESANTIS's Address and DESANTIS's Efforts to Retrieve the Package for MATEO

25.     In May 2024, investigators intercepted calls related to a package that MATEO was expecting to receive in the U.S. mail at DESANTIS's address.  For example, on May 8, 2024, at about 1:08 p.m., DESANTIS called MATEO.  DESANTIS asked MATEO when the package would be arriving ("Where is the box?"), and MATEO replied that he thought the package would be arriving the following day, Thursday, May 9, 2024 ("I think Thursday.  I think okay."). DESANTIS and MATEO then arranged for DESANTIS to buy drugs from MATEO's courier later that day.  Later that day, at about 2:51 p.m., MATEO called DESANTIS and stated that his drug courier was at the meeting location ("He's there."), and DESANTIS replied that she was about four minutes away and told MATEO, "Don't let him leave."  MATEO replied, "I'm not," and DESANTIS replied, "ok, bye."

26.     On May 9, 2024, at about 11:46 a.m., MATEO called DESANTIS at (781) 330-4722.  MATEO asked DESANTIS to confirm her mailing address because he was having issues with a package he expected to be shipped to her address ("Can you try to send me your address again?  Because it's having problems with the package now.").  DESANTIS stated that she would send MATEO her address ("I gave you the right address. But yeah I'll do it again now."), and MATEO affirmed ("Can you send it to me? Yeah.").  DESANTIS affirmed, and asked MATEO if she could receive drugs from MATEO's courier later that day (Yeah, listen – can I see him today?"), and they agreed to conduct a drug transaction later that day at about 3:00 p.m. at the same location as the previous day.  MATEO again told DESANTIS to send the mailing address "right," DESANTIS stated that she did give him the right mailing address ("I did send it right!"), and MATEO asked why there was an issue with the delivery of the package ("So why is it having a problem?").  DESANTIS replied that she did not know why there was an issue, and stated,

"Maybe because my name isn't on it."  DESANTIS confirmed that she would send MATEO the mailing address again to verify.  At about 11:50 a.m., after the phone call ended, DESANTIS texted her address to MATEO ("1 Ashby Place, Building G, Apartment 1, Bedford, MA 01730.").  At about 11:57 a.m., DESANTIS called MATEO to confirm that he received her address via text message ("Did you get it?").  MATEO confirmed, and stated that the address is correct and asked DESANTIS to look out for her mailman ("Hey! So the address is right.  Can you just pay attention to the mailman, and let him know?"), and DESANTIS replied that she would go "try to catch" her mailman to ask about the package.  MATEO further stated that the package was addressed to "Ashley Lewis," and DESANTIS replied, "Maybe that's where he screwed up.  I'll see if I can catch him, I don't know.  Okay."

27.     At about 12:02 p.m., MATEO called DESANTIS and asked if she would go to the Post Office to retrieve the package if she doesn't get to the mailman.  DESANTIS stated, "I'm looking for him. I'm driving his route, but … If he's got it in his truck it's not going to be at the USPS.  It's going to be at his truck."  DESANTIS further stated that she was going to her mailman's next stop on his route in order to find him, and that she was "chasing this guy all over town."  MATEO asked if the mailman went to DESANTIS's building already, and DESANTIS stated that she wasn't sure.  MATEO stated that he did not think that the mailman went to DESANTIS's building already "because you usually don't … you usually don't call me at this time for the package."  DESANTIS replied that it was a different mail carrier this time because her usual mail carrier broke his foot.  DESANTIS stated that she was going to go back home to wait for the mail carrier there, and MATEO agreed.  Based on my knowledge of the investigation, as well as my training and experience, I believe that when MATEO stated that DESANTIS does

not "usually" call him at that hour of the day "for the package," he was referring to previous drug packages that DESANTIS received for MATEO, and that this package was not an isolated event.

28.    At about 12:16 p.m., MATEO called the U.S. Post Office in Burlington, Massachusetts to inquire about the package.  MATEO stated that the tracking for the package showed that the package was returned to the Post Office ("I'm calling um … for a package.  It says on the tracking that it says it was returned to the USPS office because of wrong address or something.")  The postal employee asked MATEO for the tracking number for the package ("What's the tracking number?"), and MATEO provided the full tracking number ("9505514021584128933894").  The postal employee stated that she would check on the package and asked MATEO for a call-back telephone number ("Let me give the carrier a call and see.  One second.  What's a phone number to call you back?"), and MATEO provided the phone number for Target Telephone 5808.

29.    On May 9, 2024, investigators from the U.S. Postal Inspection Service located and seized the package with the tracking number that MATEO provided over the phone.  The package had a handwritten label that was addressed to "Ashly Lewis, 1 Ashby Place, Building G, Apt. 1, Bedford, MA 01730" and listed a return name and address of "Rick Lewis, 10347 Dolan Av., Downey, CA 90241."  Pursuant to a federal warrant, investigators opened the package on May 9, 2024, and inside the package, investigators seized about a kilogram of a substance that field tested positive for fentanyl.

30.    On May 9, 2024, DESANTIS and MATEO arranged a drug transaction to take place that day at about 3:00 p.m.  At about 3:01 p.m., MATEO called DESANTIS and said that his drug courier was about two minutes away from meeting with DESANTIS.  MATEO further asked if, after she completed the drug transaction, DESANTIS would personally go to the Post

Office in Burlington to check on the package, and DESANTIS agreed.  In a later call, at about 3:59 p.m., after going to the Post Office, DESANTIS called MATEO and told him that the package was returned to sender ("You're not going to like this. … It was returned to sender.") DESANTIS asked MATEO if he knew the sender of the package ("Do you know these people?"), and MATEO replied, "Ahh, ahh … it's gonna be … We lost the package because … we're going to lose it because we just … Aw shit, let me call the people."  Then, at 4:21 p.m., MATEO asked DESANTIS to send him her full name to use on the next drug shipment ("Send me your name so I can put it on the box."), and DESANTIS replied, "Kathleen DeSantis."  MATEO later texted DESANTIS, at 7:16 p.m., that he would give her extra drugs when the drug shipment package arrives ("When the package comes back, I'll give you extra.").

31.     On May 10, 2024, the day after the U.S. mail package was intercepted, MATEO and DESANTIS discussed the missing package.  At about 1:06 p.m., DESANTIS called MATEO and asked, "What's gonna happen with that box now?" MATEO replied, "I think we lost it." DESANTIS asked, "We? What do you mean, we?" and MATEO replied, "Like me and my people," referring to his drug supplier who sent the package.  DESANTIS asked MATEO if he had to pay for another shipment of drugs to be sent in the mail ("You have to pay again, for another one?"), and MATEO replied, "I think so."

May 24, 2024, Seizure of a Firearm Provided by CARRASQUILLO

32.     On May 24, 2024, MATEO communicated with one of his regular drug customers, Carlos CARRASQUILLO, who uses (207) 861-1397, about a transaction where MATEO would provide drugs to CARRASQUILLO in exchange for CARRASQUILLO providing MATEO with firearms.

33.     On May 24, 2024, at about 1:20 p.m., MATEO received a phone call from CARRASQUILLO to arrange a drug transaction for that evening.  CARRASQUILLO asked MATEO if the drugs would be the same as drugs he had previously received from MATEO ("It's the same shit, right?"), and MATEO confirmed ("Yeah").

34.     At 1:22 p.m., CARRASQUILLO called MATEO and asked if MATEO wanted to receive a firearm in exchange for the drugs ("I was going to say … You want the strap for the other one, for the other kind?").  MATEO asked CARRASQUILLO what he wanted ("What happened?") and CARRASQUILLO replied that he wanted to buy the drugs previously discussed, but he wanted to see if MATEO wanted to trade the drugs for a firearm instead of cash ("I said, I want to buy the one for 18, but I want to see if you want to trade the strap for the other one."), and that "I figured let's kill two birds with one stone."  MATEO confirmed and asked CARRASQUILLO if he wanted 100 grams of drugs for the firearm ("Alright, we could do that. You want 100 for the other … for the strap?"), and CARRASQUILLO confirmed ("Yeah, just give me the other one.  The thousand dollar one not the eighteen-hundred.  You feel me?"). MATEO agreed ("Alright.").

35.     On May 24, 2024, based on intercepted communications and physical surveillance, investigators conducted a traffic stop of LUIS's vehicle in New Hampshire, when LUIS was returning from CARRASQUILLO's residence in Maine.  Investigators located and seized a firearm in the trunk of the vehicle.

36.     On May 25, 2024, at about 12:47 a.m., after investigators stopped LUIS's vehicle and seized the firearm, LUIS called MATEO.  The following is a summary translation of the conversation:

LUIS:          Don't panic but they grabbed my car.

13

MATEO:      Is that true? What happened?

LUIS:       I'm free, but they found the gun and let me go.

…

MATEO:      But... they found the gun in front with you?

LUIS:       No, no I put it in the trunk, you know I'm not going around like that. I put it in the trunk under a bunch of things and those people dismantled the car; they flipped the car. The last thing they searched was the trunk, where the gun was placed.

…

LUIS:       Oh okay, that's what I wanted to know and for you to call "Tegua" (CARRASQUILLO) and find out if that (gun) doesn't have deaths or anything strange.

MATEO:      No, that doesn't have anything of that.

MATEO:      And what about the money?

LUIS:       It's in my pockets. In my pocket I have 800 pesos, and I had like five little balls in my balls.

MATEO:      And they didn't find that on you?

LUIS:       Nope, I just throw them in a trash barrel. Just in case.

…

LUIS:       Only thing is that I will have to vanish, you know and find another vehicle to be able to come up here to NH. I can't come in the same car because they already know me and all that.

MATEO:      Yeah.

LUIS:          I will have to find another vehicle to come up here. Every time there's work

               around up here.

Based on my training and experience, I believe that when LUIS stated, "they grabbed my car," he was referring to the traffic stop and search of his vehicle by investigators in New Hampshire described above, and when he stated, "they found the gun," he was referring to the firearm that CARRASQUILLO provided in exchange for drugs.  I believe that when MATEO asked LUIS, "about the money," he was asking LUIS whether law enforcement also seized drug proceeds from LUIS during the stop.  I believe that LUIS's statement, "I had like five little balls in my balls" was a reference to packaged bags of drugs ("balls") that he had hidden in his pants during the stop, and that when MATEO asked LUIS, "And they didn't find that on you?" he was asking LUIS whether law enforcement located and seized any drugs from LUIS, including the drugs LUIS had hidden in his pants.  I believe that when LUIS told MATEO that he "will have to find another vehicle to come up here. Every time there's work around here," LUIS was stating that he would need to use another vehicle to make drug runs to New Hampshire or Maine because of the law enforcement stop of his current vehicle.

<u>August 7, 2024: MATEO Arranged for RUIZ to Deliver Drugs to CARRASQUILLO in Maine</u>

       37.    On August 7, 2024, at about 9:13 a.m., MATEO received a phone call on Target Telephone 5808 from CARRASQUILLO.  During the phone conversation, CARRASQUILLO asked MATEO to send a drug courier to deliver unknown drugs that were the same as a prior drug delivery ("If you got the same shit, man – you wanna see, you wanna send them up?").  MATEO confirmed and asked if CARRASQUILLO liked the quality of the prior drug delivery ("Yeah. You liked the same stuff?").  CARRASQUILLO confirmed and stated that his drug customers liked the quality of the prior drug delivery ("Yeah, yeah, the same work 'cause I guess people

like it."), and MATEO confirmed and stated that he would arrange for a courier to complete the drug transaction ("Yeah, uh… yeah, alright—let me just … let me set that up.").

38.     A few minutes later, at about 9:21 a.m., MATEO used Target Telephone 5808 to call RUIZ at (857) 269-7457, whom the investigation has revealed is another drug courier for the MATEO DTO.  MATEO asked RUIZ if he was working ("Are you active?").  RUIZ replied that he was working ("Yeah, here working, you know."). MATEO replied, "Damn! So, what time do you finish?" and RUIZ replied that he would finish around 5:00 or 6:00 p.m.  MATEO stated that he would try to coordinate "something" for after RUIZ finished his other work ("Alright, let me coordinate something … let me coordinate something and I will call you, you heard?").  RUIZ replied, "That's fine, just give me a heads up. As I told you, I don't mind driving late at night— it makes no difference.  It's even better for me."  RUIZ further told MATEO that he could finish his other work that day in either Rockport or "Reading, right before Lawrence…," and MATEO confirmed that Reading—closer to Lawrence—would be better ("Alright, that's fine.  I think Reading will be most convenient—Reading is convenient.  I will let you know, you heard?").  MATEO later stated to RUIZ that he would coordinate the drug transaction for after RUIZ finished working ("Let me coordinate this for when you finish working."), and RUIZ affirmed ("Alright, let me know then.").

39.     Later that day, at about 5:06 p.m., RUIZ texted MATEO at Target Telephone 5808.  RUIZ stated that he was on the way to meet the DTO's drug customer, and asked MATEO to send the customer's address or confirm "if it is the same as last time."  At 5:10 p.m., MATEO confirmed that RUIZ was going to the same address as the previous time ("It's the same one."), and RUIZ affirmed ("Ok perfect.").  At about 5:12 p.m., RUIZ texted MATEO an address in Oakland, Maine ("527 Webb Rd Oakland ME") and asked MATEO to confirm that it was the

correct address for the drug customer ("This one, right?").  MATEO affirmed ("Yes").  Based on my knowledge of the investigation, I know that 527 Webb Road, Oakland, Maine, is CARRASQUILLO's residence.

40.     At about 6:13 p.m., MATEO texted CARRASQUILLO and stated that MATEO's drug courier was on the way ("Yo he's on the way").  At 6:56 p.m., CARRASQUILLO texted MATEO complaining that it was late in the day ("Damn mad late, *cabron*"), and MATEO replied via text that he could not find anyone available earlier, but his courier was on the road and MATEO would confirm the estimated time of arrival with the courier ("I couldn't find nobody. But he's on the road. I'm let u know the time now.").  Immediately after, at about 6:57 p.m., MATEO texted RUIZ and asked RUIZ when he would arrive at the location ("Let me know the time.").  When RUIZ did not respond to the text, at 6:59 p.m., MATEO called RUIZ.  MATEO asked RUIZ what time he would arrive at the location so MATEO could let the drug customer know ("How long is it showing, so I can let the people know?").  RUIZ responded that he was using both Google Maps and Waze GPS apps, and one showed an estimated time of arrival at 8:38 p.m. and the other showed 8:14 p.m.  MATEO replied that he would let the customer know ("Alright, okay.  I'll let them know now, alright.").  At about 7:00 p.m., MATEO texted CARRASQUILLO that his drug courier would arrive in an hour and a half, at about 8:30 p.m. ("He gets there hour and half. 8:30.").

41.     At about 8:08 p.m., MATEO called CARRASQUILLO and asked CARASQUILLO if he was home ("You in the crib?"), and CARRASQUILLO affirmed ("Yeah."). MATEO stated that MATEO's courier would be arriving at CARRASQUILLO's residence in two minutes ("Yeah, he's pulling up in like two minutes."), and that it was the same courier from a previous transaction ("It's the same guy, not from last time, but from the other

time."). CARRASQUILLO asked MATEO if it was the same drug supply as the previous time ("And it's the same work though, right?"), and MATEO confirmed ("Yeah, same shit. The same.").

42. At about 8:15 p.m., RUIZ texted MATEO, "I'm here." At about 8:15 p.m., MATEO called CARRASQUILLO and told CARRASQUILLO that his courier was at CARRASQUILLO's location ("He's there."). CARRASQUILLO asked MATEO what kind of car the courier was driving, and MATEO replied, "A CRV." CARRASQUILLO responded, "A CRV? Tell him … let me see … right here." MATEO asked CARRASQUILLO, "Have you seen him?" and CARRASQUILLO replied, "Yeah." Massachusetts vehicle registration records show that a 2012 Honda CRV is registered to RUIZ.

43. At about 8:21 p.m., RUIZ called MATEO and told MATEO that he received $1,800 from CARRASQUILLO ("Cousin, I received 18."), and MATEO confirmed that that was the correct amount ("Yes, that's how it should be."). MATEO then told RUIZ to take out $500 for himself as payment and to give the rest to LUIS in Lawrence ("Take out … let me see … 18 … Take out 500 which are yours and give the guy the rest—you can call him, the uncle."). RUIZ confirmed and stated that he was heading down to Lawrence ("Alright, I'm heading to Lawrence now, then."). MATEO told RUIZ that he would continue to contact him to complete drug transactions for the DTO ("I'll keep hitting you up."), and RUIZ affirmed ("Yes, thank you.").

<u>August 17, 2024: Drug Transaction with ORTIZ</u>

44. On August 16, 2024, at about 1:48 p.m., ORTIZ used phone (617) 304-9331 to call ANDREW, who was using Target Telephone 5808 at that time (MATEO was in the Dominican Republic). ANDREW told ORTIZ that he was struggling to find a drug supply ("Bro, I've been struggling to get that, bro."). ORTIZ told ANDREW that he was out of drugs and asked

what they were going to do ("Well what now? We're down, we're down. I don't have anything, bro. I have nothing left."). ANDREW told ORTIZ that the DTO's drug suppliers were out of drugs ("In truth, the people don't have anything.") and that it was difficult to find a drug supply at that time ("So it's a struggle to get."). ANDREW further told ORTIZ that the DTO was out of drugs ("Nothing at all bro. Even we ourselves are dry."), and that MATEO was looking for a potential drug supplier that could provide the DTO with drugs ("He's been looking for that."). ANDREW told ORTIZ that he would call MATEO to see if MATEO had made any progress with drug suppliers ("Let me call him to see what he says, you heard?").

45.     On August 16, 2024, at about 2:10 p.m., ANDREW used Target Telephone 5808 to call ORTIZ at (617) 304-9331, and ANDREW told ORTIZ that their drug supplier was going to receive a shipment of drugs the following day ("My guy, our guy is going to get something tomorrow."). ANDREW asked if ORTIZ could wait until the following day, and ORTIZ replied by asking ANDREW if the drugs were coming from their usual drug supplier ("Mmm, but … is it going to be our guy?"). ANDREW confirmed and stated that it was their "main" drug supplier who was supposed to be receiving additional drugs the following day ("Yes, yes, no, the guy … he's the main guy, he's going to get something tomorrow."). They discussed how ORTIZ's customers would be looking for drugs that day, but they agreed to talk the following day when the DTO's main drug supplier had drugs available.

46.     On August 16, 2024, at about 9:10 p.m., ORTIZ used (617) 304-9331 to text ANDREW at Target Telephone 5808 and asked if the drug shipment was confirmed for the following day ("What's up bro, it's confirmed already for tomorrow?"). ANDREW did not respond that night, and the following morning, on August 17, 2024, at about 10:51 a.m., ORTIZ texted ANDREW again asking for an update ("What's up bro."). At about 10:53 a.m., ANDREW

confirmed ("We are active already.") and told ORTIZ that they could plan to meet around 3:00 p.m. that day ("Bro give me like around 3 so I can arrive there."). ORTIZ confirmed ("Okay.").

47.     On August 17, 2024, investigators intercepted a call from MATEO, who was in the Dominican Republic at that time, and a drug supplier. During the conversation, the supplier told MATEO that the price of the drugs had gone up and the supplier would have to charge MATEO $23,000 per kilogram. MATEO confirmed the price and they agreed that MATEO's courier would meet the supplier later that day to purchase a kilogram of drugs. Based on my knowledge of the investigation, as well as my training and experience, I believe based on the price that MATEO was negotiating the purchase of a kilogram of fentanyl.

48.     Later that day, investigators intercepted another call between MATEO and the drug supplier. During this call, MATEO stated that his courier was at the supplier's location. MATEO further stated that the courier was going to take the kilogram of drugs, take out 900 grams for another customer, and then return to pay the supplier $21,000 after the courier sold the 900 grams to the customer.

49.     On August 17, 2024, at about 4:45 p.m., ORTIZ called ANDREW at Target Telephone 5808. ANDREW told ORTIZ that the drug courier—LUIS—was already in Boston ("He's already in Boston."). ORTIZ told ANDREW to instruct the courier to meet him at Cheney Street in Boston ("Tell him to meet me at Cheney"). ANDREW asked if the courier had been to the Cheney Street location before ("He has been there?") and ORTIZ confirmed ("Yes."). ANDREW told ORTIZ to give the courier 20 to 25 minutes ("Okay, give him like 20 or 25 minutes."), and ORTIZ confirmed.

50.     On this date, pursuant to a federal warrant, investigators were authorized to monitor a GPS tracking device installed on the vehicle of MATEO's main drug courier, LUIS.

The location data for LUIS's vehicle showed that on August 17, 2024, LUIS stopped in the area of the drug supplier and then arrived at Cheney Street, near the intersection of Montana Street, at about 5:45 p.m.  At that same time, ANDREW used Target Telephone 5808 to call ORTIZ, and stated that the drug courier had arrived at Cheney Street ("Bro, he's there.").  ORTIZ asked, "So should I let him in?" and ANDREW replied, "Yes."  Based on my knowledge of the investigation, as well as my training and experience, I believe that LUIS conducted a drug transaction with ORTIZ using 900 grams of the drugs LUIS had received from the supplier earlier that evening.

<u>August 18, 2024: ANDREW Arranges for RUIZ to Deliver Drugs to a Customer in Maine</u>

51.     On August 18, 2024, at about 12:29 p.m., ANDREW used Target Telephone 5808 to call (857) 269-7457 and speak to RUIZ.  During this call, ANDREW asked RUIZ if he was available to make a drug delivery that day ("Are you active to go up there?").  RUIZ asked at what time ("But at what time? Today?"), and ANDREW replied as soon as possible.  RUIZ replied that he would let ANDREW know if he was able to do that.

52.     At about 12:36 p.m., RUIZ called ANDREW over Target Telephone 5808, and confirmed that he was available and that he was getting ready to leave ("Andrew, I'm going to get ready to take off. … To do it fast.").  ANDREW replied that LUIS was home in Lawrence, where RUIZ would pick-up the drugs to deliver ("Okay, Sammy [LUIS] is at home.").  RUIZ replied that he would call LUIS so that he could leave soon for the six-hour round-trip ("Okay, so let me get in touch with him. So I can try to leave as fast as I can because you know it's like six hours round-trip.").

53.     At about 12:49 p.m., RUIZ called ANDREW and stated that RUIZ had spoken with LUIS and LUIS told RUIZ that he would be ready in an hour ("I just called Sammy [LUIS] and he told me he will take like an hour, you know?").  ANDREW asked if LUIS needed an hour

to prepare the drugs ("To get the stuff ready?"), and RUIZ affirmed ("Uh-huh.").  RUIZ asked ANDREW to send RUIZ the customer's address so that RUIZ could calculate the time for the trip ("So in the meanwhile send me the address so I can calculate the time and see if I'm going to have enough time, bro.").  ANDREW replied, "Okay."  At 12:51 p.m., immediately after this call, ANDREW texted RUIZ an address in Brunswick, Maine ("171 lunt road Brunswick").

54.     At 1:01 p.m., ANDREW texted RUIZ and asked if RUIZ was going to be able to conduct the drug transaction with the Brunswick, Maine customer ("Are you going to be able to do that cousin?").  At about 1:13 p.m., ANDREW called RUIZ, and RUIZ confirmed that he was going to meet the Brunswick, Maine drug customer ("I'm going there.").  RUIZ stated that he was going to Lawrence first (to meet LUIS), then going to meet the customer ("I'm going to Lawrence now, and then down there.").  At about 1:54 p.m., RUIZ called ANDREW and told ANDREW that he was on his way to Lawrence.

55.     At about 4:16 p.m., RUIZ called ANDREW and told ANDREW that he would arrive at the customer's address in about seven minutes.  RUIZ asked ANDREW who he was going to be meeting at the location ("You can tell me who I'm going to see over there?"), and ANDREW replied, "It's a white guy."  RUIZ asked, "Is everything cool?" and ANDREW affirmed ("Yes, no … everything is cool.").

56.     At about 4:25 p.m., RUIZ called ANDREW and told ANDREW that he had arrived at the customer's location ("My bro, I'm there."), and stated that he was in the driveway at 171 Lunt Road next to a RAV 4 and a Camry ("Yes, inside a driveway that has a RAV 4 and a black Camry—a gray RAV 4 and a black Camry. At 171.").  ANDREW replied that he would let the drug customer know ("Alright, let me call him. Let me call him.").  RUIZ told ANDREW to tell the drug customer that RUIZ was in a "gold CRV" ("Alright.  Tell him a gold CRV.").

57.     At about 4:29 p.m., RUIZ called ANDREW and told him that the customer gave him $6,200 ("6,200"), and ANDREW confirmed that that was the correct amount ("1,200 … Yes, yes, that's it."). RUIZ confirmed again that it was $6,200 ("Yeah, 6-2"), and stated that the customer was in the car with him listening to the call ("He's here with me and he's listening to you."). ANDREW confirmed the amount again and stated that the customer had sent the rest of the money by CashApp ("Yes, yes, that's it.  He sent the rest by internet.").

58.     At about 6:58 p.m., RUIZ called ANDREW and stated that RUIZ was arriving in Boston to meet with LUIS ("I'm already arriving to Boston to get together with Sammy [LUIS]."). RUIZ asked ANDREW what he should do with the money he collected from the drug customer, and whether he should give LUIS all of the money or if RUIZ should take his portion of the money out ("Tell me what I should do. If I should give him everything and after you guys communicate with me later. How are we going to do this?"). ANDREW replied that he would confirm how much RUIZ was to be paid and would call RUIZ back so that RUIZ could take his money out ("Let me call him and see.  He told me how much it was but I forgot. … Let me call him so you can take it out.").   At about 7:01 p.m., ANDREW called RUIZ back and told RUIZ to keep $800 from the drug customer's money ("Bro, keep 800."). RUIZ affirmed ("Alright my brother, okay.").

<u>August 27, 2024: Seizure of a Kilogram of Suspected Fentanyl from ANDREW<br>after ANDREW meets with a Supplier</u>

59.     August 26, 2024, at about 9:32 p.m., ANDREW used Target Telephone 5808 to exchange a series of text messages with the user of telephone (914) 774-8514 ("UM8514"). ANDREW stated, "Greetings, this is on behalf of the pool."    Based on my training and experience, I know that drug traffickers often used coded language or a code word to confirm and facilitate drug transactions, and I believe that "the pool" was such a code word.  At about 9:32

23

p.m., UM8514 responded, "Good evening;" "coordinate and see what time you can see me tomorrow;" "I'm already awake by 9:00;" and "you let me know where we could meet and what time you are able to."  ANDREW replied and told UM8514 to send him an address to meet the following day between 10:30 a.m. and 11:00 a.m. ("Send me an address so I can drop by between 10:30 and 11:00."). UM8514 affirmed ("Okay.") and that he would contact ANDREW at about 10:00 a.m. the following day to coordinate a meeting ("I will hit you up at 10:00. That way we can coordinate.").  Andrew affirmed ("Okay, alright.").

60.    On August 27, 2024, at about 9:22 a.m., UM8514 texted ANDREW at Target Telephone 5808 and stated, "Good morning, hope all is well."  ANDREW replied at 9:23 a.m. that he was already travelling towards the meeting location ("I am already making my way to that area.").  UM8514 affirmed ("Ok.").  At about 10:04 a.m., UM8514 texted ANDREW, "Let me know around what time you will be in Boston."  At about 10:09 a.m., ANDREW replied, "I will be there in about 30 min[utes]."  At about 10:40 a.m., UM8514 texted ANDREW, "I am here already."  At about 10:42 a.m., UM8514 texted ANDREW an address, "90 w west walnut park. Check how far from that place. 02119," which I believe was UM8514 asking ANDREW how far he was from the meeting location at 90 West Walnut Park in Roxbury, Massachusetts.  At about 10:46 a.m., ANDREW replied, "in 12 min[utes]."  At about 11:03 a.m., ANDREW texted UM8514, "I am here right where you take a left, in the Tahoe," and UM8514 replied, "Ok."

61.    On August 27, 2024, investigators conducted surveillance of ANDREW and the Tahoe he was operating.  At about 11:03 a.m., investigators observed ANDREW's Tahoe arrive at the intersection of West Walnut Park and Amory Street in Roxbury, Massachusetts, and parked on Miles Street near the corner of West Walnut Park.  Investigators then observed an unidentified male ("UM1") exit a white Honda CR-V that was parked on West Walnut Park carrying a black

bag.  Investigators observed UM1 enter the passenger side of ANDREW's Tahoe with the black bag.  A few minutes later, UM1 exited ANDREW's Tahoe without the black bag.  UM1 then reentered the driver's side of the white Honda CR-V and departed the area.  Based on the prior text communications between ANDREW and UM8514, I believe that ANDREW met with UM1 to conduct a drug transaction, and that the black bag that UM1 left in ANDREW's vehicle during the brief meeting contained illegal drugs.

62.     A about 11:09 a.m., after meeting with UM1, ANDREW used Target Telephone 5808 to call CARRASQUILLO.  ANDREW told CARRASQUILLO that he had received a new drug resupply ("Bro, we are now … we are now active.").  CARRASQUILLO told ANDREW that he was working at that time, and asked whether ANDREW would be delivering drugs to CARRASQUILLO personally or if ANDREW was going to send a drug courier ("Oh, yeah, yeah? Alright. I'm working right now.  Fucking, um … Uh, shit – what time … is it going to be you or somebody else?"), but ANDREW replied that he would call CARRASQUILLO back ("Bro, I'll call you back.").

63.     At about 11:10 a.m. (while ANDREW was still on the phone with CARRASQUILLO), investigators conducted a traffic stop of ANDREW's Tahoe at the intersection of Halifax Street and Ashcroft Street in Boston.  Investigators announced themselves as police, removed ANDREW from the vehicle, and read ANDREW his *Miranda* rights. Investigators asked ANDREW about the black bag that UM1 left in ANDREW's vehicle, and ANDREW responded that it was Psycho Bunny clothing.  Investigators obtained the black bag that UM1 brought into ANDREW's vehicle from the passenger rear floor of ANDREW's vehicle, and inside the bag, investigators found a brick-shaped object containing a white powdery substance with a bunny and cross bones logo imprinted on it.  Based on my review of public

websites, I know that the logo for Psycho Bunny clothing is a bunny and cross bones, which matches the logo imprinted on the brick of suspected drugs. Investigators then asked ANDREW about the brick-shaped object of suspected drugs found in the black bag, and ANDREW admitted that it was drugs and stated that he was just trying to make a living. At this time, ANDREW was released and the traffic stop was concluded. Investigators conducted a field-test of the suspected drugs, which yielded inconclusive results. Investigators subsequently sent the seized brick-shaped object of suspected drugs to a drug laboratory for testing, which is pending. Based on my knowledge of the investigation, as well as my training and experience, I believe that the brick-shaped object seized from ANDREW is a kilogram brick of suspected fentanyl.

64.     After law enforcement completed the traffic stop and drug seizure from ANDREW, at about 12:06 p.m., ANDREW used Target Telephone 5808 to call CARRASQUILLO and discuss the stop and seizure. The following are excerpts from the conversation:

ANDREW: Bro, I think those monkeys robbed me or something, dude.

CARRASQUILLO: What happened?

ANDREW: They took everything from me, bro.

CARRASQUILLO: What you mean? [Voices Overlap]

ANDREW: I, I, I had the "work" on me, bro, and the monkeys pulled me over and took everything from me.

CARRASQUILLO: They took all the "work"?

ANDREW: Yeah, bro! I think they robbed me, or I don't know, honestly.

CARRASQUILLO: Oh, fuck!

…

CARRASQUILLO: Yeah, but they took your "work"... they didn't... they didn't... so, how much was it? Was it a lot?

ANDREW: Bro, it was the whole shit!

CARRASQUILLO: Oh, the shit that you was trying to bring up here?

ANDREW: Not just your stuff; a whole one.

CARRASQUILLO: Oh, fuck!

…

CARRASQUILLO: I know Bebe [MATEO] is probably... did you... did you talk to Bebe [MATEO]?

ANDREW: Yes, I spoke with him just now.

CARRASQUILLO: Yeah, I was calling because I didn't hear from you. So, I was hitting him up... I thought you got locked up, n---a!

…

CARRASQUILLO: You're gonna have to take a flight to D.R, bro. I don't think you'll be able to come back. [Chuckles]

ANDREW: I was just thinking that now; buy a ticket and go to Santo Domingo.

CARRASQUILLO : Yo, bro. You got to, bro. Because right now... it doesn't look right, bro.

ANDREW: No, no...

Based on my training and experience, I believe that "monkeys" is a reference to law enforcement, and "the work" as used in the above-quoted call was a reference to the drugs that were seized from ANDREW by law enforcement.  I also believe that when ANDREW stated that it was a "whole one" he was referring to a kilogram of fentanyl.  I further believe that when CARRSQUILLO

asked ANDREW is he talked to "Bebe," he was asking whether ANDREW told MATEO about the drug seizure, and ANDREW confirmed that he had in response.  I further believe that, when CARRASQUILLO told ANDREW to "take a flight to the D.R.," he was encouraging ANDREW to flee the United States to avoid being arrested, and when ANDREW said that he was going to "buy a ticket and go to Santo Domingo," ANDREW was referring to fleeing the United States to avoid arrest.

65.     Later on August 27, 2024, at about 3:41 p.m., ANDREW used Target Telephone 5808 to call CARRASQUILLO again.  CARRASQUILLO asked ANDREW if he had made plans to leave the United States and go to the Dominican Republic ("What's going on, n---a? You already got fucking plans to leave?"), and ANDREW replied, "Yes, dude, I'm leaving later." CARRASQUILLO asked ANDREW if ANDREW and MATEO would slow down their drug trafficking while both were out of the country ("You going back to the D.R. so Bebe [MATEO], he gonna slow down, you know?").  ANDREW replied no, they would not slow down, because he believed the law enforcement attention was on his supplier instead of him or MATEO ("No, I don't think so … no.  Because since that didn't come from us or anything, you know."), and CARRASQUILLO agreed ("Yeah, yeah, yeah, that came from another guy …").  ANDREW further told CARRASQUILLO that the supplier he met with on August 27, 2024, prior to the seizure was not the DTO's usual drug supplier, rather it was an alternate supplier that the DTO used when they did not have anything else ("Honestly, yeah.  That is a person we would go to when we don't have anything else, you know.").

66.     The following day, on August 28, 2024, ANDREW in fact fled the United States for the Dominican Republic, and did not return to the United States until October 14, 2024.

MATEO departed for the Dominican Republic ostensibly for vacation on August 17, 2024 and returned to the United States on October 2, 2024.

### September 3, 2024: MATEO Directs LUIS to Retrieve Drugs from COLLEY and Deliver them to VENTURA

67.     On September 3, 2024, MATEO used Target Telephone 5808 to communicate with LUIS at Target Telephone 0786, as well as other DTO customers.  For example, MATEO directed LUIS to deliver new drugs and retrieve returned drugs from one drug customer, and then to deliver a portion of the returned drugs to another drug customer.  At about 12:00 p.m., Jomar VENTURA—who was recently released from a federal prison sentence—texted MATEO at Target Telephone 5808 to inquire about a drug transaction ("Wtw Brodie"), and at about 12:22 p.m., MATEO replied and asked VENTURA to send him an address for the drug transaction ("Yer wtw bro send me the address.").  VENTURA replied with an address in Boston, "290 Ruggles St."  At about 1:09 p.m., VENTURA texted MATEO that he just needed five grams of drugs ("Just need the 5 too only.").  At about 1:26 p.m., MATEO confirmed and said the transaction would take place around 3:00 p.m. that day ("Got u it would b around 3.").  VENTURA confirmed ("Smooth.").

68.     Shortly after MATEO texted VENTURA, at about 1:26 p.m., MATEO used Target Telephone 5808 to text LUIS at Target Telephone 0786, and instructed LUIS that when he met with the "white guy" in Boston—referring to COLLEY—he had to take out five grams of drugs from what LUIS received from him and deliver it to VENTURA in Boston ("Yo, when you see the white guy, take 5 out of whatever he gives back to you and bring it to someone else in Boston.").  LUIS affirmed ("Yes.")

69.     Within a minute of texting LUIS, at about 1:27 p.m., MATEO used Target Telephone 5808 to text COLLEY at (617) 676-5218.  MATEO asked COLLEY to separate out

five grams of drugs from what he was returning to MATEO ("Yo do me a favor from what u going to give back can u take out 5 aside?").  About 17 seconds later, MATEO texted LUIS that the guy in Boston—COLLEY—was going to have the five grams separated for him ("He is going to have the 5 aside."), and LUIS responded that he would see him at 3:00 p.m. ("I will see him at 3.").  At about 1:28 p.m., COLLEY replied to MATEO and told MATEO that he had mixed drugs and had five grams of "raw," or uncut drugs, left ("I got mixed and 5 grams of raw left"), and stated that MATEO should take the "raw" drugs because the mixed drugs were poor quality ("You want the raw cuz the mixed [is] no good.").  MATEO asked COLLEY how much of the mixed drugs he had left ("How much mixed?"), and COLLEY replied 25 grams ("25 mixed").  MATEO told COLLEY to return it all to LUIS and MATEO would use the mixed drugs as a cutting agent for other drugs MATEO would prepare ("Yea just give it back.  I'll use it as cut.").  COLLEY affirmed ("Ok.") and asked MATEO to confirm the 3:00 p.m. meeting time ("You said 3pm right?") and MATEO confirmed ("Yup.")

70.     At about 3:02 p.m., LUIS used Target Telephone 0786 to text MATEO at Target Telephone 5808, asking MATEO if COLLEY was already at the location because LUIS was there ("Yo, the white guy is already there? I am here, outside.").  LUIS also asked MATEO to send him the address to deliver the five grams of drugs to ("And send me the address regarding the 5.").  At about 3:07 p.m., MATEO received a text from COLLEY that stated, "I'm home." MATEO then texted LUIS that COLLEY was home and that LUIS should go inside to conduct the drug transaction ("Yes, go inside.").  MATEO also sent LUIS the address for where to deliver the five grams of drugs after ("290 ruggles st") which was the same address that VENTURA texted to MATEO earlier.  At about the same time, MATEO texted VENTURA and stated that his courier would arrive in 15 minutes ("15 min"), and VENTURA affirmed ("Smooth.").

71.    At about 3:39 p.m., LUIS texted MATEO that he had arrived at VENTURA's location and told MATEO to instruct VENTURA to come out to meet him ("Yo, I'm here. Tell him to come out."). MATEO then texted VENTURA and stated that his drug courier was at the location ("He's there."), and VENTURA affirmed ("Ight.")

72.    At about 4:14 p.m., MATEO received an incoming call on Target Telephone 5808 from COLLEY. COLLEY asked MATEO when he was getting another drug shipment ("When we getting some more food man?"). MATEO replied, "When I'm getting some more? … Of that same shit?" COLLEY confirmed, and stated that LUIS only brought him 16 grams of drugs because that was all LUIS and MATEO had left ("Yeah, 'cause he brought me 16. That's all he had left he said."). MATEO replied that he was unsure when he would get a new drug shipment and that all he had left were the same drugs that he previously gave to COLLEY ("Oh yeah, that's all he had left. Yeah. But [stutters] yeah, that's all I have left, but uh... I don't know when I'm getting some new shit. I only got the same shit I gave you last time right now."). MATEO further stated that drug prices were high but he was trying to get some high quality drugs ("Yeah, buddy, that shit's wild right now, everywhere. I'm trying – I'm trying to get some fire though."). MATEO said that he would let COLLEY know when he got a new drug shipment ("Yeah. I'll let you know when I get some new shit."), and COLLEY affirmed ("Alright, let me know. Alright.").

Ortiz October 2, 2024: Discussion of a Drug Transaction Between ORTIZ and MATEO

73.    On October 2, 2024, at about 3:35 p.m., ORTIZ used phone (617) 304-9331 to call MATEO at Target Telephone 5808. MATEO told ORTIZ that his drug courier was on his way to Boston, and that the courier was meeting with another DTO customer before going to meet ORTIZ ("The guy is on his way to Boston right now. He is going to see someone and then he

will go see you."). ORTIZ affirmed and told MATEO to send the courier to the Jamaica Plain neighborhood in Boston ("Alright let me call… Tell him to head over to Jamaica.").

74. At about 7:05 p.m., ORTIZ called MATEO at Target Telephone 5808 and asked whether the courier forgot about him ("Did the guy forget about me?"). MATEO replied that he did not have enough of the drugs for ORTIZ's order, but stated that he would have more drugs early the following day ("No, man. What happened was I thought I had enough, man, but I don't. Early tomorrow is when I'll have some."). ORTIZ responded that he had drug customers waiting and that he had no drugs left to sell them ("I have some people waiting and I have nothing, nothing."). MATEO then told ORTIZ that he would have his courier bring some of the drugs to ORTIZ that night so that ORTIZ could hold over until the additional drugs came the following day ("What I'm going to do is tell the guy to bring you some of what he has there, you heard? So that you can hang on until tomorrow. Yes?"), and ORTIZ affirmed ("Yes, exactly. So that I can hang on until tomorrow."). ORTIZ told MATEO that he wanted "fire" and MATEO responded, "No, of course. Fire."  Based on my training and experience, the reference to "fire" meant that ORTIZ wanted to make sure the drugs were high quality.

75. At about 8:29 p.m., MATEO used Target Telephone 5808 to call ORTIZ, and stated that his drug courier would meet ORTIZ in 40 minutes ("He'll be there in 40 minutes. What I did was ... I sent you seven, right."). MATEO further stated that he was giving ORTIZ drugs from a new batch that was good quality ("I had more but I prefer to give you the first batch, you understand? … So the thing is fresh and new."), and ORTIZ affirmed ("Yes, man.").

76. At about 9:15 p.m., MATEO used Target Telephone 5808 to call ORTIZ. ORTIZ asked if the drug courier had arrived to meet him ("Is he here?"), and MATEO replied that the

drug courier was there ("He's there, bro.  Alright.").  Based on my training and experience, I believe that ORTIZ completed a drug transaction with the MATEO DTO that evening.

October 4, 2024, Discussion of a Drug Transaction between LOVEREN and MATEO

77.     On October 4, 2024, MATEO used Target Telephone 5808 to communicate with LOVEREN at (603) 461-0869 (which is subscribed in her name) about arranging a drug transaction.  At about 4:10 p.m., MATEO texted LOVEREN, "hey hun," and at about 4:28 p.m., LOVREN replied, "Hey was about to text u."  LOVEREN then texted MATEO that she wanted to purchase 12 "sticks" (a common term for a 10-gram quantity) of fentanyl, as well as additional fentanyl ("fetty") and cutting agent from MATEO ("I need 12 stx & 5gs fetty & 60 gs cut please.").  At about 5:57 p.m., MATEO texted to confirm the transaction ("Ok.").  At about 6:15 p.m., MATEO called LOVEREN and told her that his drug courier would be there in 10 minutes ("Hey honey.  He'll be there in 10 minutes, okay?"), and LOVEREN replied, "Alright."  After discussions about the drug courier being late because he "forgot something," at about 7:06 p.m., LOVEREN texted MATEO that she had been at the meeting location but the courier was not there ("Been here don't see him."), and MATEO replied that the courier would arrive in five minutes ("5 min").  Based on my knowledge of the investigation, as well as my training and experience, I believe that MATEO's drug courier completed a fentanyl transaction with LOVEREN on October 4, 2024.

October 5, 2024, Discussion between MATEO and COLLEY about a Drug Transaction

78.     On October 5, 2024, COLLEY called MATEO and told MATEO that he was home and ready to meet with MATEO's drug courier ("I'm ready.  I'm home.").  MATEO replied that he was meeting with his drug courier right then to give the courier the supply of drugs ("Aight, I'm meeting the dude right now, to give it to him.").  MATEO further stated that the drugs were

"freshly made" and that COLLEY was going to have to "blend it." MATEO asked COLLEY, "You got a blender right?" and COLLEY confirmed ("Yeah."). MATEO further stated that the unspecified drugs were "going to be chunks," and told COLLEY, "You're going to have to blend it yourself." Based on my training and experience, the statements that the drugs were "freshly made" and in "chunks" likely means that the drugs were broken directly form a pressed kilogram brick, and when MATEO stated that COLLEY would have to "blend it," he was stating that COLLEY would have to use a blender to break the "chunks" into a fine powder, and potentially add a cutting agent.

<u>October 9, 2024, Discussion Between MATEO and BOUTLER about Acquiring Firearms</u>

79.     On October 9, 2024, MATEO used Target Telephone 5808 in a text message exchange with BOUTLER who was using (603) 660-9671. During the text conversation, at about 12:11 p.m., BOUTLER texted MATEO a photo that was a screenshot of a Taurus G3 semiautomatic handgun for sale at Bass Pro Shops, along with the message, "Check this out buying this today." A few minutes later, BOULTER sent MATEO another photo that was a screenshot of a Taurus G3 semiautomatic handgun with a stainless-steel slide for sale at Bass Pro Shops, along with the message, "Or should I get this stainless steel 17 + 1 vs 15 + 1 with the all black for just $20 extra?" Based on my training and experience I know that "17 + 1" refers to the firearm's capacity to hold 17 bullets in the magazine plus one additional bullet in the chamber, for a total capacity of 18 bullets. MATEO replied, "That's nice bro," and "Yes, get the stainless steel." MATEO further told BOULTER to let MATEO know if BOULTER had firearms for sale ("If u got some for sale let me know"), and BOULTER replied that he did not currently have any for sale but that he would buy one for MATEO ("No but I'll be happy to pick you up one."). BOULTER further stated that he could buy two firearms and BOULTER would give MATEO a

firearm in exchange for drugs ("I can order 2 and you can take that off the next batch?").  MATEO replied asking if BOULTER could buy a Glock and stated that he would take a Glock in exchange for drugs ("They have Glocks? I'll take a Glock.").  BOULTER stated that he was not sure if he had enough money to buy the more expensive Glock and told MATEO to check the Bass Pro Shops website to see the pistols BOULTER could buy, with a link to the Bass Pro Shops website for centerfire pistols.

October 25-26, 2024: Discussion of Drug Quality between LOVEREN and MATEO

80.     On October 25-26, 2024, MATEO communicated with LOVEREN to ask her about the quality of a recent drug shipment he provided to her on October 24, 2024. On October 25, 2024, at about 3:39 p.m., MATEO texted LOVEREN and asked if she had received any feedback about the drug quality ("Hey hun, any feedback?").  On October 26, 2024, at about 4:42 a.m., LOVEREN responded and stated the feedback on drug quality was "mixed" and that she thought that the "lighter" drugs might be better quality.  At about 9:31 a.m., MATEO responded and asked if the quality of the 130 grams of fentanyl was good ("everything good with the 130") and asked which of the two samples he provided was better ("From the samples, which one is better the bigger or the smallest sample?").  At about 2:14 p.m., LOVEREN responded and stated that she thought the "bigger" sample was better quality and confirmed that her customers did not complain about the quality of the 130 grams of fentanyl ("Bigger I think … N I got no complaints on the 130.").  A few minutes later, LOVEREN texted MATEO again and stated, "No my runner said the smaller one was better I heard him wrong sorry."  Based on my knowledge of the investigation, as well as my training and experience, I believe that LOVEREN was referring to a drug courier that worked for her delivering drugs to her customers when she referred to her "runner."

<u>October 29, 2024: Drug Transaction between LOVEREN and MATEO</u>

81.     On October 28, 2024, in the evening, LOVEREN used (603) 461-0869 to text

MATEO at Target Telephone 2247 and told him that she needed 13 "sticks" (10-gram quantities

of fentanyl) plus ten grams of fentanyl ("Hey I need 13stx asap please. … N 10 GS of fetty.").

At about 8:28 p.m., MATEO responded that his courier would not make it to LOVEREN that

evening, but MATEO would send him to LOVEREN early the following day ("Hey he won't

make it.  I can send tomorrow early.").  LOVEREN replied, "Oh no. OK damn."

82.     The next morning, October 29, 2024, at about 11:51 a.m., LOVEREN texted

MATEO, "Hey can I get that now," referring to the drugs she ordered the previous day.

LOVEREN further stated, "I really need that asap please … 13 stx & 10gs fetty please."  MATEO

replied at 12:16 p.m. and confirmed ("Got u hun.").  MATEO told LOVEREN that the courier

would meet her at a Hannaford's parking lot at about 3:00 p.m.  At about 3:14 p.m., LOVEREN

called MATEO and stated that she had been waiting at Hannaford's for about 10 minutes but the

courier was not there yet, and MATEO said he would call the courier.

83.     On October 29, 2024, investigators conducted surveillance of this anticipated drug

transaction.  Investigators established surveillance in the area of LOVEREN's residence in

Manchester, New Hampshire, and observed LOVEREN depart her residence in a red Kia Forte

at about 3:00 p.m.  LOVEREN was the driver and sole occupant of the vehicle.  Investigators

followed LOVEREN as she travelled to a Hannaford's grocery store parking lot located in East

Side Plaza on Hanover Street in Manchester, New Hampshire.  At about 3:20 p.m., investigators

observed LUIS arrive in the Hannaford's parking lot and park next to LOVEREN's vehicle.

Investigators observed LUIS exit his vehicle carrying a large manila envelope/package, approach

the driver's side of LOVEREN's vehicle, and hand the package to LOVEREN through the

driver's side window.  LUIS then took an item form LOVEREN and put it inside his sweatshirt pocket, before returning to his vehicle and departing the area.

84.     At about 3:24 p.m., MATEO called LOVEREN and told her that the money she gave LUIS was "short" because she was supposed to pay $1,700 and she only gave $1,500. LOVEREN disagreed and stated that she gave LUIS $1,700 because she "counted it three times in the car, and it was 17," and told him to count it again.

<u>October 31, 2024: Drug Transaction between BOULTER and MATEO</u>

85.     On October 31, 2024, BOULTER used (603) 660-9671 to communicate with MATEO at Target Telephone 2247 to arrange a drug transaction for that day.  During a text conversation that morning, BOULTER asked to conduct a drug transaction that afternoon, and MATEO replied, "I got you."  MATEO told BOULTER that he would send the same amount of drugs as the prior drug transaction ("I got the same order ready from last time."), and BOULTER replied, "Oh ok."  BOULTER told MATEO that he would have $900 in cash for the transaction ("I'll have 900. Cash.").  At about 2:07 p.m., BOULTER texted MATEO and told MATEO to let him know when the drug courier started to travel to BOULTER's location ("Let me know when he has left."), and MATEO replied that the courier was 15 minutes away ("He's 15 min away."). At about 2:08 p.m., MATEO called BOULTER and stated again that the courier was 15 minutes away ("Hey, he be there in 15 minutes.").  BOULTER affirmed and asked what the drug amounts were ("Alright bro. And, what is it…"), and MATEO replied, "Um … it's six and two."  Based on my knowledge of the investigation, as well as my training and experience, I believe that "six" and "two" were referring to the number of "fingers," or ten-gram quantities of fentanyl in two different strengths.

86.     At about 2:30 p.m., MATEO called BOULTER and stated that the drug courier had arrived at BOULTER's location ("Hey DoorDash is outside."), and BOULTER confirmed ("Alright.  Thanks, man.").   On October 31, 2024, investigators were receiving GPS location data for LUIS's vehicle.  At about 2:31 p.m., LUIS's vehicle arrived at BOULTER's residence located at 635 Shasta Street in Manchester, New Hampshire, and departed the area three minutes later, at about 2:34 p.m.  At about 2:34 p.m., MATEO texted BOULTER and asked BOULTER to confirm that he gave the courier $900 in cash ("Hey 900 u gave him?"), and BOULTER replied that he gave him $940 ("940.").  MATEO replied that he gave the courier $900 for the drugs and $40 for the courier ("Anytime yea u gave 900 and 40 for him, right?"), and BOULTER confirmed ("Yes.").

<u>November 2, 2024: Drug Delivery to CARRASQUILLO's Residence</u>

87.     On November 1, 2024, investigators intercepted a call between MATEO using Target Telephone 2247 and CARRASQUILLO.  On November 1, 2024, at about 4:18 p.m., CARRASQUILLO called MATEO, and CARRASQUILLO asked MATEO when he was going to send one of his drug couriers to Maine ("Yo! When you gonna send like, one of your guys?"). MATEO replied that one of his drug couriers was already in Maine earlier that day ("Dude, he was around that way today."), and CARRAQUILLO asked when a courier would be coming back to Maine because CARRASQUILLO was out of drugs ("Oh shit! Yeah cause I'm definitely not … I'm dry, I'mma need it today, n----.  When he'll be, when is he coming back up, you don't know?").  MATEO replied that it might be ten days before he sends another courier to Maine ("I don't know, usually it's like … like in 10 days, dude…").   During the conversation, CARRASQUILLO stated that he had $1,800 to pay for drugs that day, and that he had enough customers lined-up to sell the drugs ("I mean, I got enough today, a whole 18 … I mean, I got

enough plays so …").  CARRASQUILLO also stated that he did not want to send one of his drug couriers to Massachusetts in his car because the car was registered in his name and he has prior drug trafficking convictions ("That's what I'm saying, and this plate is under my name on drug trafficking convictions and all that, so…").  MATEO suggested that CARRASQUILLO send his courier via the train and MATEO would pay the courier with extra drugs ("But, if you send someone just send them on the train, you understand? Tell them I'll gift them something … I'll gift them something of mine.").  CARRASQUILLO replied that the train plan might work but his drug courier prefers crack cocaine over fentanyl ("Yeah, he might, the only thing is that he likes crack.  The n---- that could do that, he fucks with the crack more than he fucks with the dope, you feel me?"), and MATEO affirmed.  CARRASQUILLO stated that he would let MATEO know what he wanted to do, and the call ended.

88.     On November 1, 2024, at about 4:29 p.m., CARRASQUILLO called MATEO again, and told MATEO that he would purchase the full $1,800 worth of drugs from MATEO if MATEO would send a courier to his location in Maine ("Yo, I was thinking, n----, damn … I would spend the full 1,800 if you can come up then.  You think you can make that happen?").  MATEO asked, "For when?" CARRASQUILLO replied, "You probably can't do it today, huh?" and MATEO replied, "Nah, I don't think today, but tomorrow yes."  MATEO further stated that he would see if he could find a drug courier to go to Maine the following day and he would let CARRASQUILLO know ("Um, let me see if I can find someone, and I'll let you know right away, okay?").   Shortly after the call ended, at about 4:38 p.m., MATEO texted CARRASQUILLO that he would send a courier the following day around noon ("Yo tomorrow around 12").

89.     The following day, on November 2, 2024, CARRASQUILLO called MATEO. CARRASQUILLO asked MATEO if MATEO was sending a drug courier to Maine that day and about the quality of the drugs ("What, you trying to send him up here? That's the same shit, you got the fire or…?"), and MATEO confirmed that the drugs were the same quality ("It's the same, it's the same, fucker."). CARRASQUILLO affirmed and told MATEO to send the courier ("Alright then, n----, just send him. Fuck it!"). MATEO responded that he would talk to his drug couriers so they could meet CARRASQUILLO as soon as possible ("Alright, cool. Let me hit up my people, so we can do that as soon as possible."), and asked CARRASQUILLO to send MATEO his address again ("Send me the address again, okay?"). As soon as the phone call ended, CARRASQUILLO texted MATEO, "527 Webb Rd Oakland Maine," which is CARRASQUILLO's residence.

90.     On November 2, 2024, investigators monitored remote video surveillance outside of LUIS's residence located at 48 Brookfield Street in Lawrence, Massachusetts. Based on my knowledge of the investigation, I know that LUIS stores drug at his residence used for distribution, and that when the DTO's drug couriers deliver drugs to Maine, they typically will stop at LUIS's residence first to pick-up the drugs for the customer's order. Through the remote video surveillance, investigators observed a Ford Fusion arrive in the area of 48 Brookfield Street and park on the street outside of LUIS's residence at about 1:12 p.m. At about 1:14 p.m., investigators observed LUIS walk from his residence at 48 Brookfield Street, across the street towards where the Ford Fusion was parked and out of view of the video surveillance. About two minutes later, at about 1:16 p.m., investigators observed the Ford Fusion pull away from the curb on Brookfield Street and depart the area. A few minutes later, investigators observed LUIS walk back to his residence and go inside for a few minutes, before exiting the residence again and

entering his Hyundai Sonata that was parked in front of the residence.  At about 1:25 p.m., LUIS

departed the area in his Hyundai Sonata.[1]

91.     At about 1:28 p.m., MATEO received a call from CARRASQUILLO.  During the

call, MATEO told CARRASQUILLO that his drug courier would arrive at CARRASQUILLO's

residence in about 2 hours and 25 minutes ("He will arrive in 2 hours and 25 minutes."), and

CARRASQUILLO affirmed.  Based on my review of open-source information from Google

Maps, the estimated time to travel from LUIS's residence at 48 Brookfield Street in Lawrence,

Massachusetts, to CARRASQUILLO's residence at 527 Webb Road in Oakland, Maine, is about

2 hours and 28 minutes.

92.     At about 1:30 p.m., the Ford Fusion was photographed by a City of Lawrence

license plate reader camera travelling northbound towards Route 495.

93.     At about 3:27 p.m., MATEO texted CARRASQUILLO that his drug courier was

about an hour away ("Hour out still.").  At about 4:44 p.m., MATEO called CARRASQUILLO,

and CARRASQUILLO directed MATEO to have his drug courier "back up to my spot" because

he did not want the courier sitting in the location where he was then located.  CARRASQUILLO

instructed MATEO to tell the drug courier "to come to the door," and CARRASQUILLO also

told MATEO that he had the money to pay for the drugs on CashApp ("I got that shit on CashApp

too, right?").  MATEO confirmed and told CARRASQUILLO, "Go outside so I can tell him."

At the end of that call, MATEO texted CARRASQUILLO with instructions to send the money

on CashApp to "$eliannatejeda," which is a CashApp account associated with MATEO's wife.

---

[1] Based on the GPS tracking data for LUIS's Hyundai Sonata, obtained pursuant to a
federal warrant, after departing 48 Brookfield Street, LUIS's Hyundai travelled southbound to the
Boston area.  LUIS's Hyundai Sonata did not travel to Maine on November 2, 2024.

A few minutes later, CARRASQUILLO called MATEO to confirm that MATEO received his CashApp payment of $1,800 ("You got it? You got it on CashApp?"), and MATEO confirmed.

<u>November 4-10, 2024: MATEO and BOULTER Discuss Recruiting New Drug Customers</u>

94.    On November 4, 2024, MATEO used Target Telephone 2247 to communicate via text with BOULTER.  At about 9:44 a.m., MATEO asked BOULTER if he had any drug customers that he could get for MATEO ("U don't have no friends u can send this way?"), and BOULTER demurred.  MATEO told BOULTER that his business was not going well ("Thing are going bad for me. … Idk what's going on.").  BOULTER responded that he would let MATEO know when a potential drug customer in Maine completed a "mandatory sober living program," and MATEO replied, "Ok let me know bro."  Later in the conversation, BOULTER asked MATEO if he lost any drug customers ("Have you lost any people?"), and MATEO affirmed ("Yea I lost a few peoples yea.") and that he needed to gain additional customers ("I need to pick up new people to stay on float.").  BOULTER stated, "I'm guessing you lost a couple bigger clients?" and MATEO responded, "Some just stopped doing it others got locked away and just people switch on me."  BOULTER responded, "Dude I'll be happy to help you win back. … Let me know if you want to have a convo about this and I can give you should [*sic*] suggestions."  A few hours later, BOULTER texted MATEO that he contacted all of his drug customers and told them to refer new drug customers ("I just told all of my people that if they know anybody at all to send them to me or it may all go away…").

95.    On November 9, 2024, BOULTER texted MATEO and told MATEO that he just talked to the "kid from Maine."  Based on my knowledge of the investigation, as well as my training and experience, I believe BOULTER was referring to the Maine drug customer whom BOULTER discussed on November 4 as being in "mandatory sober living," as described above.

BOULTER stated that the new Maine drug customer was going to purchase drugs from MATEO through BOULTER initially ("So they're going to go thru me initially and then you directly after."). BOULTER stated that he told the Maine customer that the price was $250 per ten-gram "stick" of fentanyl, which was a $50 mark-up from MATEO's usual price because the customer was from northern Maine where the fentanyl prices were much higher ("I also told them it's $250 per stick so that'll be 50 extra for you. Don't worry about the price they will go 6 hours up in northern Maine and sell it for anywhere between 750 and 1000 per stick!!!"). BOULTER further told MATEO that when the Maine customer places a drug order that he should make sure the drugs were strong or high quality ("Just want to make sure when they do reach out to me which will be in the next couple weeks that you make sure it's strong. I don't know why I even say that bro since we both know you will since you always do"). MATEO confirmed and stated, "Word, let me know bro I really hope he come tru." BOULTER replied that he thought a drug deal with the new Maine customer was "definitely happening."

> November 6, 2024: Drug Transaction arranged between MATEO and COLLEY

96.     On November 6, 2024, MATEO used Target Telephone 2247 to communicate with COLLEY. At about 7:42 p.m., COLLEY called MATEO and asked if MATEO's courier was at COLLEY's location ("So, he is here right now, right?"), and MATEO confirmed ("Yeah."). COLLEY asked if the courier brought the "glass" ("Alright so he uh … he bring the glass?"), and MATEO confirmed ("Yeah."). Based on my training and experience, I know that "glass" is a common slang term for methamphetamine. COLLEY further stated that the courier was bringing 100 grams of cutting agent for the drugs, but COLLEY only wanted 20 grams of raw drugs ("But he bring ... he bring a hundred seasoning; I just wanted 20, I just wanted 20 in raw."), and that the courier told COLLEY to talk to MATEO ("So, he told me to talk to you.").

MATEO asked whether COLLEY wanted the hundred grams of cutting agent ("Oh so you didn't want the hundred?"), and COLLEY replied that he did not want it but he took it anyway and paid the courier for everything except for the 100 grams of "seasoning" ("No, but I will take it anyway but nah, dude cause it get bad and I don't even know why. I gave him the money; I just paid him except for the seasoning."). MATEO asked COLLEY how much money he gave the courier ("Alright, yeah, so how much you gave him?"), and COLLEY responded that he gave him $2,700 ("So, I gave him … I gave him uh, 2,700.") and that he just owed another $100 ("So I just owe him 100."), and MATEO affirmed ("Alright, bro.").

<u>November 12, 2024: Drug Transaction arranged between MATEO and COLLEY</u>

97.    On November 12, 2024, at about 3:28 p.m., COLLEY called MATEO at Target Telephone 2247. During the conversation, COLLEY asked MATEO if his courier had left yet ("Um … your people didn't leave yet, right?"), and MATEO replied, "Nah." COLLEY stated that he wanted the courier to bring him 50 grams of drugs later that day because one of his drug customers called him for drugs ("I'mma need 50 of that instead 'cause someone just called. Now I'mma need 50, 50 of that."). COLLEY further asked MATEO to include some cutting agent with the drug order ("A 50, and if you can throw some seasoning like we talked about earlier, we can do that too, if you want to."). MATEO confirmed ("Yeah, I got you brodie."). COLLEY asked MATEO to confirm that the courier would meet COLLEY at his residence at around 6:30-7:00 pm. that evening ("Ight. Yeah, about 6:30-7:00 I'll be home. Ight?"), and MATEO affirmed ("Ight."). COLLEY repeated his drug order ("So, a 50 and some seasoning, ight?"), and MATEO confirmed again ("For sure.").

98.    On November 12, 2024, beginning at about 5:15 p.m., investigators established physical surveillance in the area of COLLEY's Residence (Target Location 3). At about 6:16

p.m., investigators observed LUIS's vehicle arrive at 590 American Legion Highway and park in the rear parking lot behind that building.  At about 6:18 p.m., investigators observed LUIS exit his vehicle and enter the front door to 590 American Legion Highway and walk up the stairs of the apartment building.  From outside the building, investigators observed, through an exterior window of the building, two males meeting inside a second-floor apartment. At about 6:20 p.m., investigators observed LUIS exit the front door to 590 American Legion Highway, reenter his vehicle, and depart the area.  Investigators observed the other male still in the same apartment, and at about 6:37 p.m. investigators observed that male exit the front door to 590 American Legion Highway, at which point investigators were able to positively identify that individual at COLLEY based on his driver's license photo and prior surveillance of COLLEY.

### Undercover Drug Transactions with the MATEO DTO

99.     On multiple occasions between February 7, 2024, and July 16, 2024, investigators utilized an undercover officer ("UC") to conduct drug transactions with the MATEO DTO.  For all of the UC drug purchases, the UC communicated with MATEO to order drugs, including fentanyl, methamphetamine, and cocaine.  MATEO personally conducted the transaction with the UC on one occasion, and LUIS met with the UC to conduct all of the other drug transactions with the UC.

### The Target Locations

#### *Target Location 1 – MATEO's Residence*

100.    **11 Chesley Street, Millville, Massachusetts:**  Target Location 1 is a two-story single-family dwelling located at 11 Chesley Street in Millville, Massachusetts.  The location has a long driveway leading to a two-car garage that has white and gray vinyl siding, which is attached to the main structure that has yellow siding.  The entrance is located on the right side of the

building when looking from Chesley Street, with a covered porch over the entryway and a black mailbox to the right of the door. Within the curtilage of Target Location 1 are outbuildings, including a shed to the right of the driveway.

101.    Based on physical and electronic surveillance and intercepted calls, I believe that MATEO resides at Target Location 1 with his wife. MATEO and his wife purchased Target Location 1 in January 2024, and both of their names are on the deed. MATEO's wife's name is listed as the utilities subscriber for Target Location 1. MATEO's Massachusetts firearms license listed Target Location 1 as his residence. Physical and electronic surveillance have consistently shown MATEO and his vehicles at Target Location 1, and during the course of this investigation, the location data for MATEO's phones showed that the phones were in the vicinity of Target Location 1 on a near daily and nightly basis.

102.    As detailed above, MATEO is the leader of a DTO that distributes fentanyl, methamphetamine, and cocaine to redistributor customers in Massachusetts, New Hampshire, and Maine. MATEO utilizes couriers to carry out the drug transactions, but MATEO is primarily the person responsible for discussing drug business with the DTO members and arranging drug transactions. Based on intercepted communications and location data for MATEO's phones, MATEO was consistently at Target Location 1 when he was conducting the DTO's drug business by phone. Moreover, intercepted calls demonstrate that MATEO stores drugs at Target Location 1. For example, on November 14, 2024, MATEO used Target Telephone 2247 to call his wife, and during the call he asked here about the location of "the white bag from the other day … the bag with the drugs." His wife replied that the bag was in her vehicle, and MATEO instructed her to take the bag of drugs out of her car and "put it in the safe." Moreover, intercepted communications have also demonstrated that MATEO obtained a firearms license and purchased

firearms that he stored at his residence.  Massachusetts firearms registration information shows that MATEO has at least one firearm registered to Target Location 1.  Based on my knowledge of the investigation, as well as my training and experience, I believe that the safe MATEO was referring to was located at Target Location 1, where MATEO and his wife reside together.

103.    Accordingly, I believe that evidence of MATEO's ongoing drug trafficking activities, including drugs, drug distribution paraphernalia, drug proceeds, records/ledgers detailing drug transactions and drug debts, customer lists, phones used to conduct his drug business (including Target Telephones 5808, 7090, and 2247), records of other money transactions, and firearms, as set forth in Attachment B-1, will be found at the Target Location.

### Target Location 2 – LUIS's Residence

104.    **48-50 Brookfield Street, Lawrence, Massachusetts:**  Target Location 2 is a three-level multi-family dwelling located at 48-50 Brookfield Street in Lawrence, Massachusetts. The building has beige siding with white trim.  The front entryway along Brookfield Street has a bump-out porch leading to a white entry door.  On white trim above the front porch is the number "48" in black.  There is a driveway to the right side of the residence with a white vinyl fence across the driveway.  At the rear of the driveway, on the right-side of the residence is a side-entry door that leads to a lower-level apartment.  The door is a solid white door underneath a covered overhang.  **Target Location 2 is the residence accessed by this side-entry door.**

105.    Based on physical and electronic surveillance, I believe that LUIS resides at Target Location 2.  Throughout the investigation, LUIS regularly slept at Target Location 2, and was observed coming and going from Target Location 2, including in relation to drug transactions as detailed above.  LUIS's vehicles were also regularly parked overnight in the area of Target

Location 2, and the location data for LUIS's phones were in the vicinity of Target Location 2 on a near daily and nightly basis. LUIS was seen leaving the side-entry door on November 18, 2024.

106.     As detailed above, LUIS has been engaged in ongoing drug-trafficking activity. Physical and electronic surveillance and intercepted communications showed LUIS regularly leaving directly from Target Location 2 to conduct drug transactions, and returning to Target Location 2 afterwards.  Intercepted communications also demonstrated that LUIS would store and prepare drugs for the DTO's customers at Target Location 2, as detailed above.

107.     Accordingly, I believe that evidence of LUIS's ongoing drug trafficking activities, including drugs, drug distribution paraphernalia, drug proceeds, records/ledgers detailing drug transactions and drug debts, customer lists, phones used to conduct his drug business (including Target Telephones 0786 and (401) 612-8162), records of other money transactions, and firearms, as set forth in Attachment B-1, will be found at Target Location 2.

### Target Location 3 – COLLEY's Residence

108.     **590 American Legion Highway, Apt. 6, Roslindale, Massachusetts:**  Target Location 3 is an apartment within the Legion Arms Condominiums building.  The structure at 590 American Legion Highway is a three-story apartment/condominium style building with a red brick exterior, with common entrances located at the front and rear of the building, with green awnings above the entry doors.  The front entry door leads to a set of stairs.  **<u>Target Location 3 is Apartment 6, located on the second floor</u>**.  The door to Apartment 6 appears to have single lock.

109.     Based on physical and electronic surveillance, I believe that Target Location 3 is COLLEY's residence.  During the investigation, on intercepted communications, COLLEY and MATEO/LUIS discussed meeting COLLEY for drug transactions on American Legion Highway.

During the drug transaction between COLLEY and LUIS on November 12, 2024, described above, investigators conducting surveillance observed COLLEY inside his apartment through an exterior window, and investigators were subsequently able to identify that specific apartment in which COLLEY was seen as Apartment 6.  The utilities for Apartment 6 are subscribed to an individual with whom COLLEY has numerous phone contacts.  Phone location data for COLLEY's phone regularly showed that the phone was in the vicinity of Target Location 3, including regularly overnight.

110.    As detailed above, COLLEY has been involved in long-term and ongoing drug trafficking activity.  As part of his drug trafficking operation, COLLEY has conducted drug transactions with other members of the MATEO DTO, particularly LUIS, at Target Location 3.  On multiple occasions, through physical surveillance, investigators observed LUIS go into COLLEY's Residence to conduct drug transactions, based on intercepted communications.  In particular, on November 12, 2024, as described above, COLLEY and LUIS met inside Target Location 3 to conduct a drug transaction.

111.    Accordingly, I believe that evidence of COLLEY's ongoing drug trafficking activities, including drugs, drug distribution paraphernalia, drug proceeds, records/ledgers detailing drug transactions and drug debts, customer lists, phones used to conduct his drug business (including (617) 676-5218), records of other money transactions, and firearms, as set forth in Attachment B-1, will be found at Target Location 3.

### *Target Location 4 – MATEO's Stash Location*

112.    **17 Bickford Street, Apt. 202, Boston, Massachusetts:** Target Location 4 is a three-level apartment style building maintained by the Boston Housing Authority.  The building is made of red brick with square windows encased in white trim.  **<u>Target Location 4 is</u>**

**Apartment 202.**  There are entry doors directly into Apartment 202 at the front and rear.  The front entrance is a green door, and on the white window trim next to the door is the number "202."

113.    Based on physical and electronic surveillance, as well as intercepted communications, I believe that Target Location 4 is a stash location for MATEO.  Target Location 4 is listed as the address for the CashApp account of MATEO's wife, which MATEO has routinely used for his drug customers to send payment for drugs.  Throughout the investigation, MATEO, LUIS, and other members of the DTO would go to Target Location 4 in relation to their drug trafficking activity, including bringing money to Target Location 4.  When MATEO left the United States for the Dominican Republic, he left his vehicle parked on Bickford Street directly in front of Target Location 4, and when he returned to the United States on October 2, 2024, MATEO went directly to Target Location 4, changed clothes, and left from Target Location 4 to collect drug proceeds.  Throughout the investigation, surveillance and location data for LUIS's vehicle showed LUIS travelling to Target Location 4 on multiple occasions after conducting drug transactions and collecting drug proceeds.  For example, on November 1, 2024, location data for LUIS's vehicle showed that LUIS travelled to Target Location 4.  A few days later, on November 4, 2024, intercepted communications demonstrated that LUIS left $1,800 in suspected drug proceeds at Target Location 4 for MATEO.  More recently, GPS location data for MATEO's vehicle showed that MATEO's vehicle arrived at Target Location 4 on November 15, 2024, at about 5:38 p.m., and remained parked at Target Location 4 until November 17, 2024, at 9:15 p.m. The location data for MATEO's Target Telephone 2247 was in the vicinity of Target Location 4 on November 16, 2024, at about 1:58 p.m.[2]

---

[2] This was the only time during the time period MATEO's vehicle was at Target Location 4 that investigators received location data for MATEO's phone.

114.    Accordingly, I believe that evidence of the MATEO DTO's ongoing drug trafficking activities, including drug distribution paraphernalia, drug proceeds, records/ledgers detailing drug transactions and drug debts, customer lists, phones used to conduct his drug business, and records of other money transactions, as set forth in Attachment B-2, will be found at Target Location 4.

*Target Location 5 – ANDREW's Residence*

115.    **488 Newbury Street, Springfield, Massachusetts:**  Target Location 5 is a two-story multi-family residence with beige and white trim.  At the front, there is a porch with white fence and pillars, and on the center-left pillar is the number "488."  At the left side of the building from the street is a driveway, and at the rear of the driveway is a side-rear entrance to 488 Newbury Street with a small, covered porch.  At the <u>right side</u> of the building from the street is a separate entrance that juts out from the side of the building with a white door under a small, separate covered porch, and next to this door is a mailbox with the number "490."  This entrance, with the mailbox labeled "490" is **<u>not</u>** part of Target Location 5; rather Target Location 5 is the unit marked "488" accessed by the front door or the left-side door at the driveway.

116.    Based on physical and electronic surveillance, ANDREW resides at Target Location 5.  ANDREW's driver's license and his vehicle registrations list Target Location 5 as his residence.   Location information for ANDREW's phones and GPS location data for ANDREW's vehicle—before he went to the Dominican Republic and after he returned from the Dominican Republic—regularly showed in the vicinity of Target Location 5, including overnight. In addition, on November 15, 2024, investigators conducted physical surveillance of ANDREW and observed him exit Target Location 5 at about 6:47 a.m. using the left-side rear entrance located at the end of the driveway.

117.    As detailed above, ANDREW has been involved in the DTO's ongoing drug trafficking activity.   During August 2024, when MATEO was travelling out of the country, ANDREW took over primary responsibilities for running the DTO's drug dispatch operations, and coordinated with the DTO's customers and couriers to conduct drug transactions.   While ANDREW was using the drug dispatch phone to coordinate drug deals, location data for that phone regularly showed that the phone ANDREW was using was in the vicinity of Target Location 5.   In addition, on the day investigators seized a kilogram of fentanyl from ANDREW, ANDREW departed that morning from Target Location 5 to meet the drug supplier and acquire the kilogram of fentanyl.

118.    ANDREW returned to the United States from the Dominican Republic on October 13, 2024. On October 17, 2024, ANDREW activated (413) 777-7942 (the "7942 Phone"), which is subscribed in his name at the address for Target Location 5. On October 18, 2024, at about 8:25 a.m., ANDREW texted LUIS from the 7942 Phone and stated, "Yo, it's Andrew."  A few minutes later, ANDREW called LUIS, and ANDREW stated that he would be at LUIS's residence in about 45 minutes ("Yo, uh … I will get there in 45 minutes.").   ANDREW stated that the GPS on his phone was not working but he thought he remembered how to get to LUIS's residence. LUIS replied confirming the address of his residence ("It's 48 Brookfield, you know."), and the two discussed how to get to LUIS's residence from the highway.  Later in the conversation, ANDREW told LUIS to call MATEO ("Bebe") and tell MATEO to call ANDREW at the 7942 Phone ("Yo! Uh, check and see if you get in touch with Bebe [MATEO] and tell him to call me at this number.").  LUIS affirmed and stated that he would send MATEO the number for the 7942 Phone via a messaging application ("Alright, let me send it to him in a message.").   ANDREW also

asked LUIS to send him MATEO's "work" number, referring to his drug dispatch phone ("Yes, send me his work number to this number."), and LUIS affirmed ("Alright, let me send it to you.").

119.    At about 9:13 a.m., ANDREW called LUIS, and asked if LUIS was outside of his residence ("Are you outside?"), and LUIS affirmed ("Yes, I'm outside."). ANDREW stated that he was "behind the church," and LUIS told him to "head over to number 50" which was "further down from the church." Investigators observed via remote video surveillance that, at about 9:15 a.m., the ANDREW's Tahoe arrived and parked in front of LUIS's residence (*i.e.*, Target Location 2). At about the same time, ANDREW called LUIS and told LUIS to give him an extra $15 or $20 to pay for tolls, and he would pay MATEO back later ("Yo, bring me 15 or 20 pesos to pay for the toll. I will give it back to Bebe [MATEO] later."), and LUIS confirmed ("Alright."). On remote video surveillance, investigators observed LUIS exit from the rear of his residence, walk to ANDREW's Tahoe, and enter the front passenger seat of the Tahoe. At about 9:19 a.m., LUIS exited the front passenger seat of the Tahoe and returned to his residence, again using the same rear door. A minute later, LUIS texted ANDREW, "9788851201," and stated, "that is the password." Based on my training and experience, I know that it is common to use a password or token in money laundering transactions so that the parties involved in the money exchange—who often do not know one another—can confirm the transaction. Based on my knowledge of the investigation, as well as my training and experience, I believe that that LUIS provided drug proceeds to ANDREW inside the Tahoe, and LUIS provided ANDREW with the password to exchange with a money launderer to whom ANDREW was going to give the drug proceeds.

120.    Accordingly, I believe that evidence of ANDREW's ongoing drug trafficking activities, including drug distribution paraphernalia, drug proceeds, records/ledgers detailing drug

transactions and drug debts, customer lists, phones used to conduct his drug business, and records

of other money transactions, as set forth in Attachment B-2, will be found at Target Location 5.

**Drug Traffickers' Use of Residences, Storage Spaces, and Cell Phones Generally**

121.    Based upon my experience and the experience of other law enforcement officers

who have participated in the execution of numerous search warrants at the residences and stash

locations of drug traffickers, I am aware that the following kinds of drug-related evidence have

typically been recovered during searches of drug-traffickers' residences and stash locations:

   a.   Controlled substances.

   b.   Paraphernalia for packaging, processing, diluting, weighing, and distributing
        controlled substances, including but not limited to, plastic bags, heat-sealing
        devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and
        substances used to "cut" or dilute illegal narcotics.

   c.   Books, records, receipts, notes, ledgers, and other papers relating to the purchase,
        storage, or distribution of controlled substances.  Such documents include, but are
        not limited to, prescriptions, ledgers, text or email messages from or to suppliers,
        customers or associates pertaining to the transportation, ordering, sale, and
        distribution of controlled substances or the disposition of proceeds, bank records,
        money orders, wire transfers, cashier's checks, checkbooks, passbooks,
        certificates of deposit, vehicle rental receipts, credit card receipts, and receipts
        reflecting rental properties and/or storage units.

   d.   Personal books and papers reflecting names, addresses, telephone numbers, and
        other contact or identification data relating to the identity and contact information
        for co-conspirators, drug suppliers, and drug customers.  Such documents include,
        but are not limited to, telephone address books, planners, notes, ledgers, and
        telephone bills.

   e.   Cash, currency, and currency counting machines, and records relating to
        controlled substances income and financial transactions relating to obtaining,
        transferring, laundering, concealing, or expending money or other items of value
        made or derived from trafficking in controlled substances.  Such items include,
        but are not limited to, jewelry, precious metals such as gold and silver, precious
        gems such as diamonds, titles, deeds, monetary notes, registrations, purchase or
        sales invoices, and bank records.

   f.   Documents or tangible evidence reflecting dominion, ownership, and/or control
        over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any

other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

g.  Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

h.  Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

i.  Firearms and ammunition;

j.  Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

k.  Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

41.  Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers often maintain such documents

related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

42.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at their residences, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

43.     Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds. Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals. In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

44.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes, hidden compartments, or other containers so that other individuals who enter their residence do not discover these materials.

45.     Many drug dealers receive their drugs through overnight parcels and keep mailing labels and airbills both used and unused in their residence for future use.  Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union,

and/or wire to their suppliers in order to pay for a continuing supply of drugs. Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.

46.     During the course of searches of residences, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the residences. Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offense. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping. Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility. For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills. These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

47.     Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators. As described above, the Target Subjects was intercepted using cellular phones to communicate about the DTO's drug trafficking activities. In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple

57

cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences.  Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences.  As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

48.      Based upon my knowledge, training, and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training and experience, I know that many cellular telephones have the capabilities described above.

49.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices. I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging. I also know that persons who sell illegal drugs regularly keep records of their illegal activities. These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates. Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone. From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B-1 and B-2 on their cellular telephones.

50.     Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e mail, electronic messages, and updates to online social networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including

their sources of supply, and can aid in identifying those individuals.  Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

51.     Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards.  I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

a.   Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.   Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.   Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

**Unlocking Devices Using Biometric Features**

60

52.     I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device, and/or content contained on the device, via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

53.     On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID.  If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor.  In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

54.     The passcodes that would unlock the Target Subjects' devices (hereinafter, the "Target Devices") found during the searches of the Target Locations are not currently known to law enforcement.  It may be useful to press the finger(s) of the user(s) of the Target Devices found during the searches of the Target Locations to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device, and/or content within the device, for the purpose of executing the search authorized by this warrant. The government may not

otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

55.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Target Location to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

56.     For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of the Target Subjects to the sensor of the devices or place the devices in front of his face for the purpose of attempting to unlock the device in order to search the contents as authorized by these warrants.

122.    The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachments B-1 and B-2. If, however, law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

## CONCLUSION

123.    I submit that there is probable cause to conclude that the Target Subjects have

conspired to distribute and possess with intent to distribute controlled substances, in violation of

21 U.S.C. § 846, and that evidence of said criminal offense, as set forth in Attachments B-1 and

B-2 will be found at the Target Locations.


I, Mark J. Concannon, hereby state under penalty of perjury that the contents of this

affidavit are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

/s/ Mark J. Concannon
_____
Mark J. Concannon, Task Force Officer
Drug Enforcement Administration

Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal
Procedure 4.1 this ____day of November 2024.   November 19, 2024

_____
Honorable M. Page Kelley
United States Magistrate Judge
District of Massachusetts